UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 10-20330 |
| Plaintiff, | Mark A. Goldsmith |
| vs. | United States District Judge |
| STANLEY GILL, | Michael Hluchaniuk |
| | United States Magistrate Judge |
| Defendant. | |
| _____/ | |

**REPORT AND RECOMMENDATION**
**DEFENDANT'S MOTION TO SUPPRESS (Dkt. 14)**

**I.   PROCEDURAL HISTORY**

Defendant was indicted on June 22, 2010, and charged with a single count of possessing a firearm following the conviction for a felony-level offense. (Dkt. 3). The present motion to suppress was filed on August 4, 2010. (Dkt. 14). The motion was referred to the undersigned on August 5, 2010. (Dkt. 15). The evidentiary hearing with respect to the motion was initially scheduled for September 20, 2010. (Dkt. 16). By stipulation of both parties, the evidentiary hearing was adjourned a number of times but was ultimately conducted on March 14, 2011. At the conclusion of the hearing, the parties requested time to file post-hearing briefs. The government filed their brief on April 26, 2011. (Dkt. 29). Defendant filed his supplemental brief on May 12, 2011. (Dkt. 30). The

government had the option to file a reply brief on or before May 19, 2011, but declined to exercise that option. Therefore, the matter was fully submitted by the parties as of May 19, 2011.

## II. ARGUMENTS OF THE PARTIES

In his initial motion to suppress (Dkt. 14), defendant asserts that on June 11, 2009, officers entered his mother's residence on Bellcreek in Flint, without permission and thereafter searched the premises without the consent of anyone or a warrant. Defendant asked for the suppression of the evidence based on what he contends was an illegal search and seizure. The government's response (Dkt. 29), filed after the evidentiary hearing, was that defendant's mother allowed the officers to enter her residence, after she was informed by the officers that they were looking for defendant, and then led them to the stairs to the basement where defendant was found. The government further contends that following the arrest of defendant and his removal from the basement, an officer went to the basement and inadvertently found a handgun while attempting to retrieve clothing for defendant at the request of defendant's mother. In defendant's supplementary brief (Dkt. 30), he claims that the government did not prove that the officers obtained consent to enter the premises and, even if they had consent to enter, they did not have consent to search the basement.

## III. RELEVANT FACTS

At the evidentiary hearing held on March 14, 2011, the government called four witnesses and the defense called three witnesses. The first witness for the government was Lt. Kevin Shanlian, who was employed by the Genesee County Sheriff's Department. He testified that, in June of 2009, he was involved in a fraud investigation and gathered sufficient evidence to believe there was probable cause to arrest defendant for that crime. (Dkt. 25, Tr., pp. 8, 19). Lt. Shanlian received information that defendant's vehicle had been seen in an area of Flint close to where defendant's mother resided on Bellcreek. (Tr., p. 9). In the early morning hours of June 11, 2009, Lt. Shanlian went to that address and observed what he believed was defendant's vehicle parked there. He called for assistance from other officers and waited near the house for the other officers to assemble at that location. (Tr., pp. 9-10). When the three other officers arrived at the residence at approximately 7:30 a.m., Lt. Shanlian and Sgt. John Fontana went to the front door of the house while the other two officers went to cover the outside of the house. (Tr., p. 10). The officers knocked on the front door and waited for about "10-15 seconds" for someone to come to the door. Mrs. Patricia Gill, defendant's mother, came to the door wearing a bathrobe. (Tr., pp. 10, 39). After Mrs. Gill came to the door, the officers informed her they were "looking" for defendant and Mrs. Gill stated she did not think he was there. (Tr., p. 10). When the officers noted his car

was in the driveway, she said he must be in the basement and then "let" them in the house. *Id*. Mrs. Gill then led the officers to the stairway to the basement and, while walking in that direction, she called out to her son and said the police were there to arrest him. *Id*. Lt. Shanlian heard a male voice respond from the basement and Shanlian walked down the stairway and observed the defendant standing in the doorway between the room located immediately at the bottom of the steps and an adjacent room. (Tr., p. 11). Defendant was dressed only in his underwear. Sgt. Fontana and Sgt. Parks, who had entered the house after Lt. Shanlian, also came downstairs and assisted in placing defendant under arrest. *Id*. The defendant and the three officers went upstairs with the defendant still clad only in his underwear. As the officers walked defendant towards the front of the house, Mrs. Gill spoke to Lt. Shanlian and asked him to go and get some clothes for defendant so that defendant would not have to go to the jail with only his underwear on. (Tr., p. 12). Lt. Shanlian went back downstairs and entered the room, an apparent bedroom, adjacent to the main room in the basement and looked for clothes for defendant. On one of the two beds in the room, the one that had boxes and other items stacked on top of it, Lt. Shanlian observed a shirt and pants that looked like someone had taken them off and laid them there. *Id*. When he picked up the shirt he observed a handgun laying between where the shirt had been and the pants underneath. Lt. Shanlian seized the gun and took the gun, along with the clothing, upstairs without

searching anywhere else in the basement. (Tr., pp. 12-13). When defendant was shown the gun he stated that it was his "girl's gun." *Id*. During this process defendant had been somewhat "disrespectful" to the officers and Mrs. Gill apologized to the officers for her son's conduct. (Tr., p. 15).

The second witness called by the government was Rodolfo Lopez, who was a sergeant with the Genesee County Sheriff's Department. Sgt. Lopez participated in the events of June 11, 2009, at the Bellcreek residence. His responsibility was to cover the rear area of the house during this attempt to arrest defendant. (Tr., p. 44). Sgt. Lopez did not see what happened at the front door but, during the time he was there, he did see Mrs. Gill and he also saw defendant. He described Mrs. Gill as having a "calm demeanor" and being "cooperative" at the times he observed her outside the house on that occasion. (Tr., pp. 45, 51). When Sgt. Lopez was informed that defendant was under arrest, he met the other officers at his vehicle and observed defendant in his underwear. (Tr., p. 51).

John Fontana, another sergeant with the Sheriff's Department, was the next witness to testify. According to his testimony, he had gone to the front door of the Bellcreek residence with Lt. Shanlian, where they were met by a female who "let" them in the house. (Tr., p. 60). Sgt. Fontana said the officers were "definitely invited" in by Mrs. Gill. *Id*. Mrs. Gill never mentioned she was "not dressed" and the officers did not tell her that she "had" to let them in the house. (Tr., p. 68).

Fontana recalled that after the officers entered the house, Mrs. Gill "yelled downstairs" to her son after which the officers went downstairs and arrested defendant. (Tr., pp. 60-61). Fontana and Shanlian came up together with defendant and when they came upstairs, Mrs. Gill spoke with Shanlian about getting some clothes for defendant, but Fontana took defendant outside to one of the police vehicles. (Tr., pp. 62-63). Mrs. Gill never told the officers that they had to leave. (Tr., p. 68).

The final witness for the government was Gerald Parks, who was also a sergeant with the Sheriff's Department. He testified that, while his initial responsibilities were the "exterior perimeter," he was called into the house shortly after Shanlian and Fontana entered the house. (Tr., p. 80). When Parks first entered the house he observed Shanlian talking with Mrs. Gill, who was wearing a bathrobe. (Tr., pp. 90-91). Mrs. Gill then walked towards the steps to the basement and "hollered" downstairs for her son. (Tr., pp. 81, 91). Parks went downstairs with Shanlian and Fontana to make defendant's arrest and when the officers came upstairs, Parks heard Mrs. Gill ask Shanlian to get some clothes for defendant. (Tr., pp. 82-84). Shanlian then went back downstairs to get clothes for defendant and was down there a "couple of minutes." (Tr., p. 85).

The defense called Mrs. Patricia Ann Gill, defendant's mother, as a witness. She testified she came to the door that morning wearing only a "see-through night

gown" and that she did not want to open the door for the officers because she had "no clothes on." (Tr., pp. 101-02). She said the police told her they had a "warrant" for defendant's arrest and, while she acknowledged opening the door, she denied "inviting" the officers into the house and said they "just walked in." (Tr., p. 104). Mrs. Gill walked "around" the officers into the kitchen and "called out" to her son, who was downstairs, saying the police were "looking" for him. (Tr., p. 104). Two of the officers then "walked past" her and went downstairs. Only one of the two officers came up with defendant while the other, "shorter" one stayed downstairs. (Tr., p. 105). That officer then came up holding a gun and said "look what I found." (Tr., p. 106). After the officer came up with the gun, Mrs. Gill "might" have asked the officer about getting some clothes for defendant and when the officer went back down to get them he stayed longer than she thought he should be there. When she asked to go down and see what was taking so long she was told by an officer that she couldn't go. (Tr., pp. 109, 129).

On cross examination, Mrs. Gill acknowledged that when she testified before a grand jury on a previous occasion she stated she was "naked" when the officers came to the door rather, than saying she was wearing a see-through nightgown as she had said during the hearing. (Tr., p. 113). She also acknowledged that the front door of the house had a "big glass window." (Tr., p. 115).

A second witness was called by the defense - Mica Soree Taylor. Ms. Taylor, defendant's girlfriend, testified that she had come to the Bellcreek house the night before with defendant. (Tr., p. 153). When they arrived between ten and eleven at night they spoke with Mrs. Gill. (Tr., p. 161). Ms. Taylor testified that the gun found in the house the next day belonged to her and she had left the gun there, under her coat, when she left very early in the morning of June 11, 2009, to pick up her daughter. (Tr., pp. 159-61). Ms. Taylor was not present when the officers arrived at the house in the morning of June 11, 2009.

Lt. Shanlian testified in rebuttal for the government. He stated that Mrs. Gill had wanted to talk to defendant after he was in the police vehicle and to provide him with some shoes that she had obtained for him. She spoke with him "briefly" at the car. (Tr., p. 168). Lt. Shanlian also testified to some prior inconsistent statements made by Ms. Taylor. (Tr., pp. 172-76).

## IV. ANALYSIS AND CONCLUSIONS

Defendant challenges the seizure of the firearm from the Bellcreek residence claiming: (1) the officers did not have the consent of Mrs. Gill to enter the premises, and (2) the officers did not have consent to enter the basement and the only person with authority to consent to enter the basement was defendant. (Dkt. 30, pp. 5-6). The government argues that Mrs. Gill gave consent to enter the premises and that, as the owner of the house, she had authority to authorize the

officers to go to any location within the residence, including the basement. (Dkt. 29, pp. 4-5).

The government can justify the warrantless entry of a residence by showing, by a preponderance of the evidence, that proper consent was obtained. *United States v. Hinojosa*, 606 F.3d 875, 881 (6th Cir. 2010). The government maintains here that consent to enter the Bellcreek residence on June 11, 2009 was given by Mrs. Gill, the owner of the premises. Defendant argues that Mrs. Gill did not give consent to enter the premises and, indeed, she objected to the officers entering the house because she was "unclothed." (Dkt. 30, p. 4). Defendant does not challenge the authority of Mrs. Gill to authorize the officers to enter the house, but contends she simply did not give consent.

Lt. Shanlian and Sgt. Fontana both testified that Mrs. Gill invited them into the house when she answered the door and was told by the officers they were looking for defendant. (Tr., pp. 10, 60). They also testified she never told them she did not want them to come in because she was not dressed. (Tr., pp. 20, 68). She expressed uncertainty about defendant being at the house, but when it was pointed out that his car was in the driveway she said he must be in the basement. (Tr., p. 10). Lt. Shanlian and Sgt. Parks testified that Mrs. Gill had a bathrobe on that morning. (Tr., pp. 39, 91).

Mrs. Gill's testimony was that she went to the door in a "see through

nightgown" and told the officers she did not want them in the house because she "didn't have any clothes on." (Tr., pp. 101-02). She said the officers persisted in asking to enter the residence and eventually she opened the door and "they just walked in" and she did not "invite" them in. (Tr., p. 103).

It is clear that there is no way to reconcile the different versions of how the officers entered the Bellcreek residences. If one believes the officers, they had consent and if one believes Mrs. Gill, they did not. The undersigned credits the testimony of the officers and concludes that they did have consent to enter the premises. The testimony of the officers was clear, logical, and generally consistent as to what was said and how it was that they entered the house. On the other hand, the testimony of Mrs. Gill was illogical and inconsistent with other evidence in the case as well as perhaps influenced by bias. The testimony of Mrs. Gill that she would answer the door at 7:30 in the morning with a see-through nightgown on is not logical. She might very well have been in her night clothes at that time of the morning, but it seems unlikely that a woman of her age and maturity would respond to a knock on the door dressed in that fashion, where the door had a "big glass window" in it. If the door had such a window, as she described, people coming to the door would be able to see her in whatever she wore to answer the door. Additionally, she did not testify that once the officers were in the house she excused herself to put something more appropriate on and the uncontradicted

testimony was that she went outside the house to speak to her son and provide him with some shoes. If she was attired as she described she would have, at the least, put something else on once the officers were in the house. It seems highly unlikely she would have dealt with the officers and gone outside her residence in a see-through nightgown.

On a prior occasion she testified, under oath, that she was "naked" when she answered the door and during this hearing she said she had a "see through nightgown" on. This inconsistency suggests an intent to exaggerate the testimony. This exaggeration was perhaps intended to explain the false claim that she did not want the officers to enter. Inconsistency on a material issue is also a common method of impeachment of a witness's credibility. Another inconsistency relating to Mrs. Gill's testimony is her initial statement to the officers that she did not think her son was there. However, she had talked to her son and Ms. Taylor the night before and "knew" they were there. (Tr., p. 161). The desire to protect her son by telling the officers her son was not there, when the evidence indicates she knew he was there, is perhaps a common feeling a mother would have under such circumstances. That desire to protect her son is the type of bias that could influence Mrs. Gill's testimony and detracts from her credibility in these circumstances. That desire to protect could also cause Mrs. Gill to try to correct her "mistake" of letting the officers in the house by falsely claiming during the

hearing that she had not invited them in. (Tr., p. 103).

Defendant argues that, even if the officers were invited into the house, they were not authorized to go to the basement and only defendant could have authorized them to do that. (Dkt. 30, p. 6).[1] While it is clear that defendant did not give consent to the officers, there is no evidence that he objected to the officers being in the basement to arrest him. Federal law clearly provides that consent may be given by a third party with common authority over the premises. *Hinojosa*, 606 F.3d at 881, citing, *United States v. Matlock*, 415 U.S. 164 (1974). In this case, the officers testified that they entered the residence and Mrs. Gill led them to the top of the basement stairs while she called out to her son and informed him the police were there to arrest him. Mrs. Gill said the officers asked her where her son was in the house and she then "jumped" in front of them, implying she was blocking them from going further into the house, but then testified she did not say anything to them and walked through the living room to the kitchen to the top of the stairs to the basement. (Tr., p. 104). Lt. Shanlian, reasonably, concluded this conduct amounted to Mrs. Gill "escorting" them to the stairway to the basement. (Tr., p. 10). It is undisputed that Mrs. Gill was the owner of the house and the uncontradicted testimony was that she had access to all the areas of the house

---

[1] Defendant cites a case from the Michigan Court of Appeals in support of his argument in this regard. Michigan law does not control the decisions of a federal court in a prosecution for a federal crime.

including the bedroom area of the basement where defendant slept when he stayed at her house. (Tr., p. 131).

With respect to Mrs. Gill's consent for the officers to go to the basement, the undersigned concludes that her actions of responding to the question by the officers as to the whereabouts of her son by walking in front of them through the living room and kitchen to the top of the stairs to the basement, while calling out to her son in the basement, constitutes consent for them to enter the basement. She had authority to consent and her conduct reasonably indicated to the officers that she had consented to them going to the basement. Consent need not be verbally given in order to be appropriate. *Hinojosa*, 606 F.3d at 882, citing *United States v. Carter*, 378 F.3d 584, 589 (6th Cir. 2004) (consent proper where agent requested permission to follow wife to bedroom where she said husband was and wife led them there without objection). Additionally, after the officers had effected defendant's arrest and brought defendant upstairs, Mrs. Gill expressly authorized Lt. Shanlian to return to the basement and obtain clothing for defendant. It was on this trip to the basement when Lt. Shanlian testified that he found the handgun that is the subject of this prosecution. Based on his testimony, at the time of the seizure of the handgun, he had been expressly authorized to go to the basement by Mrs. Gill, who had the authority to allow him to go there.

Mrs. Gill testified that Lt. Shanlian brought up the handgun from the

basement prior to being expressly authorized to return to the basement for the clothing. Again, there is a clear contradiction in the testimony of the officer and Mrs. Gill in this regard. The undersigned again credits the testimony of Lt. Shanlian over the testimony of Mrs. Gill. Mrs. Gill's testimony is biased in that her son is facing prosecution in this matter and her impeached testimony relating to the issue of the consent to enter the premises causes the undersigned to disbelieve her testimony as to when Lt. Shanlian found the handgun.

## V.    RECOMMENDATION

Based on the above, the undersigned concludes that the officers had proper consent to enter the premises and to go to the basement were the handgun defendant is alleged to have possessed was found. Defendant poses no other challenge to the conduct of the law enforcement officers. Therefore, it is **RECOMMENDED** that defendant's motion to suppress be **DENIED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a

party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: June 13, 2011

s/Michael Hluchaniuk
Michael Hluchaniuk
United States Magistrate Judge

## CERTIFICATE OF SERVICE

      I certify that on June 13, 2011, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to the following: <u>Nancy A. Abraham, AUSA, and Kenneth M. Scott</u>, and that I have mailed by United States Postal Service the paper to the following non-ECF participant(s): <u>Pretrial Services Agency and United States Marshal Service</u>.

                                                                       <u>s/Tammy Hallwood</u>
                                                                       Case Manager
                                                                       (810) 341-7887
                                                                       tammy_hallwood@mied.uscourts.gov